## DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. CROIX

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 2016-0020** |
| | ) | |
| **SHAWN MCINTOSH,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| —————————————————————— | ) | |

**Attorneys:**
**Alphonso G. Andrews, Jr., Esq.,**
St. Croix, U.S.V.I.
    *For the United States*

**Omodare B. Jupiter, Esq.,**
St. Croix, U.S.V.I.
    *For Defendant*

## <u>MEMORANDUM OPINION</u>

**Lewis, Chief Judge**

THIS MATTER comes before the Court on the "Motion to Suppress Tangible Evidence and Incorporated Memorandum of Points and Authorities in Support Thereof" (Dkt. No. 26) filed by Defendant Shawn McIntosh, and the Government's "Response to Defendant's Motion to Suppress" (Dkt. No. 28). For the following reasons, the Court will grant the Motion in part and deny it in part. Specifically, the Court will grant the Motion as it pertains to Defendant's statement regarding a firearms license and deny it in all other respects.

## I.     PROCEDURAL HISTORY AND FACTUAL BACKGROUND[1]

On September 6, 2016, the Government filed an Information against Defendant charging Defendant with three counts. (Dkt. No. 17).[2] Count 1 is Possession of Firearm by Felon in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). Count 2 is Possession of Firearm with Obliterated Serial Number in violation of 18 U.S.C. §§ 922(k), 921(a)(1). Count 3 is Possession of Crack Cocaine with Intent to Distribute in violation of 21 U.S.C. § 841(a)(1), (b)(1)(c).

On October 3, 2016, Defendant filed the instant Motion seeking to suppress all "tangible evidence [that] directly resulted from [Defendant's] illegal seizure" as well as "any evidence obtained as the fruit of any of this impermissibly obtained evidence." (Dkt. No. 26 at 3). The Government filed its Response on October 11, 2016, in which it argued that "some of the evidence seized was abandoned, and the rest was seized pursuant to a lawful arrest based on probable cause." (Dkt. No. 28 at 1).

A suppression hearing was held on October 25, 2016, during which Virgin Islands Police Department ("VIPD") Task Force Officer Detective Moses President, VIPD Detective Rolando Huertas, and VIPD Officer Daryl Walcott testified for the Government, and the Government introduced several exhibits. On November 1, 2016, the Court entered an Order requiring supplemental briefing. (Dkt. No. 34). In accordance with that Oder, the Government filed its "Supplemental Response to Defendant's Motion to Suppress" (Dkt. No. 39); Defendant filed his

---

[1] The Court bases the background factual discussion in this section on the record established at the suppression hearing. The Court provides this information solely for the purposes of this pretrial motion, ever mindful that Defendant is presumed innocent until proven guilty. Most of the facts discussed herein are alleged, but at this stage not conceded or proven beyond a reasonable doubt to the factfinder.

[2] Prior to the filing of the Information, the Government commenced the current action by filing a Criminal Complaint on August 3, 2016.

"Post-Hearing Brief in Response to the Court's Order dated November 1, 2016" (Dkt. No. 40); the Government filed its "Reply to Defendant's Post-Hearing Brief Re Defendant's Motion to Suppress" (Dkt. No. 41); and Defendant filed his "Reply to Government's Post-Hearing Brief" (Dkt. No. 43). Briefing concluded on December 5, 2016.

The following facts emerged from the record established at the suppression hearing. Shortly after midnight on July 9, 2016, VIPD Detective Leon Cruz, Detective President, Detective Huertas, and Officer Walcott were together on an assignment that took them to the Hidden Island Bar and Restaurant on St. Croix. The Hidden Island Bar and Restaurant is in a high-crime area where there have been several arrests involving guns, drugs, and fights. Detective Cruz and Detective President were riding together in an unmarked police car with private license plates, while Officer Walcott and Detective Huertas were in an unmarked police vehicle that had police department license plates on the front and back of the vehicle. Detective Huertas and Officer Walcott were wearing polo shirts with police logos on the side and black bullet-proof vests with bold, white letters that said "Police" on the front and back. The two unmarked police vehicles approached the building from opposite directions (one driving east and the other driving west) and both turned to face the building at about the same time. The vehicles stopped such that they were parallel to each other, about five feet apart, facing the building. There were three individuals by the building facing the vehicles, two of whom were standing while the third—Defendant—was sitting on the ground. The unmarked police vehicles stopped approximately 10-12 feet away from the three individuals.

When the two unmarked police vehicles pulled up and stopped in front of the building, Defendant suddenly stood up and started running west toward the edge of the building. As he stood up, a black object fell from his person to the ground. Officer Walcott saw the black object fall and

recognized that it was a gun magazine. Additionally, Detective Cruz shouted out "magazine." Detective Huertas exited his vehicle and yelled "police, stop," but Defendant continued running. Detective Huertas chased after Defendant and was soon behind him running north on the western side of the building. While he was running after Defendant, Detective Huertas noticed that Defendant ran with one hand in front of him. Detective Huertas testified that, in his experience, this indicated that Defendant was getting ready to discard or use something—possibly a weapon. Seeing this, Detective Huertas drew his weapon but kept it pointed down away from Defendant.

Defendant quickly reached the northwest corner of the building. Detective Huertas, fearing that Defendant was carrying a weapon and would round the corner of the building before him, yelled "drop it!" Defendant tossed an object away from himself while at the same time turning east at the corner of the building and running the other way. When he turned the corner and started running east, Defendant glanced over his right shoulder back at Detective Huertas. Detective Huertas saw Defendant toss the object and thought that it might have been a gun. When Detective Huertas cleared the corner of the building, he yelled "get down." Defendant stopped running, laid face down on the ground, and said "don't shoot." Once Detective Huertas saw that Defendant's hands were empty, he re-holstered his weapon and proceeded to handcuff Defendant.

Officer Walcott, who had been running behind Detective Huertas, quickly arrived at the spot where Defendant was laying down. Detective Huertas informed Officer Walcott of the object he had seen Defendant toss, and instructed Officer Walcott to search by the side of the building to locate it. Using his flashlight, Officer Walcott looked and discovered in the grass a black firearm without a magazine. After he found the firearm, Officer Walcott notified dispatch of his finding, returned to where Defendant and Detective Huertas were, and asked Defendant whether he had a license to possess a firearm. Defendant, who was still handcuffed, answered "no."

Defendant was escorted to the front of the building and subjected to a pat-down search, which uncovered cash and plastic vials, some of which contained a white substance. The white substance field tested positive for crack cocaine. Around this time, Officer Walcott called the supervisor of the firearm division to ask whether Defendant had a license to possess a firearm in the Virgin Islands. The supervisor of the firearm division stated that Defendant did not have a firearms license.

## II.     DISCUSSION

### A.     The Initial Seizures

Defendant asserts that the manner in which the two police vehicles suddenly approached caused him to stand up and flee, and that the Government failed to prove that he abandoned the magazine because there is no evidence that he was aware that he had dropped the magazine. Defendant also argues that the officers effected a seizure when Detective Huertas yelled "drop it" and Defendant tossed the firearm shortly thereafter. Defendant asserts that this seizure, as well as the one that occurred when Defendant laid down on the ground, was not supported by reasonable suspicion.

The Government counters that Defendant abandoned the magazine and the firearm and, thus, has no standing to challenge their seizures. The Government further argues that, even if Defendant did not abandon the firearm, by the time Defendant tossed the firearm the officers had reasonable suspicion to support a seizure.

The Court concludes that no seizure occurred when Defendant dropped the magazine. Further, the officers possessed reasonable suspicion by the time Detective Huertas ordered Defendant to drop the firearm and by the time the magazine was ultimately seized. Accordingly, there was no Fourth Amendment violation by the police in any of these respects.

## 1.    Applicable Legal Standards

The initial step of any Fourth Amendment seizure analysis is "to determine whether a seizure took place and, if so, when the seizure occurred." *United States v. Brown*, 765 F.3d 278, 288 (3d Cir. 2014) (citing *United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008); *Johnson v. Campbell*, 332 F.3d 199, 205 (3d Cir. 2003)). "[F]or there to be a seizure, the police must apply physical force to the person being seized or, where force is absent, have the person seized submit to a show of police authority." *United States v. Valentine*, 232 F.3d 350, 358 (3d Cir. 2000) (citing *California v. Hodari D.*, 499 U.S. 621, 624 (1991)). "Thus, if the police make a show of authority and the suspect does not submit, there is no seizure." *Id.* Similarly, a seizure does not occur where police recover property that has been abandoned. *Hodari D.*, 499 U.S. at 629. This is so because individuals forfeit their privacy interest in their personal property when they abandon it. *United States v. Fulani*, 368 F.3d 351, 354 (3d Cir. 2004). "Proof of intent to abandon property must be established by clear and unequivocal evidence." *Id.*

In *Terry v. Ohio*, 392 U.S. 1 (1968), the Supreme Court held that "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Mathurin*, 561 F.3d 170, 173-74 (3d Cir. 2009) (internal quotes omitted). Such brief investigative stops are "seizures" subject to Fourth Amendment protection. *Campbell*, 332 F.3d at 205 (citing *Terry*, 392 U.S. at 21). The constitutionality of a *Terry* stop involves a two-part assessment:

> First, we examine "whether the officer's action was justified at its inception"—that is, whether the stop was supported by reasonable suspicion at the outset. . . . Next, we determine whether the manner in which the stop was conducted "was reasonably related in scope to the circumstances which justified the interference in the first place."

*United States v. Johnson*, 592 F.3d 442, 452 (3d Cir. 2010) (quoting *Terry*, 392 U.S. at 19-20).

Reasonable suspicion "is a less demanding standard than probable cause." *Alabama v. White*, 496

U.S. 325, 330 (1990). Because "probable cause means 'a fair probability that contraband or

evidence of a crime will be found,' the level of suspicion necessary to justify a *Terry* stop is

somewhat lower and can be established with information that is different in quantity or content

from that required for probable cause." *United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006)

(quoting *White*, 496 U.S. at 330).

      "A reasonable suspicion of criminal activity may be formed by observing exclusively legal

activity," *United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000), and it is well established that

"nervous, evasive behavior is a pertinent factor in determining reasonable suspicion," *Valentine*,

232 F.3d at 357. However, the police officer must demonstrate that the stop was based on

something more than an "inchoate and unparticularized suspicion or hunch." *United States v.*

*Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 27) (quotations omitted). "Reasonable

suspicion is an 'elusive concept,' but it unequivocally means that 'the detaining officers must have

a particularized and objective basis for suspecting the particular person stopped of criminal

activity.'" *United States v. Brown*, 448 F.3d 239, 246 (3d Cir. 2006) (quoting *United States v.*

*Cortez*, 449 U.S. 411, 417-18 (1981)). In evaluating reasonable suspicion, courts "must consider

'the totality of the circumstances—the whole picture.'" *Sokolow*, 490 U.S. at 8 (quoting *Cortez*,

449 U.S. at 417). Unprovoked flight from police in a high crime area may be sufficient to establish

reasonable suspicion. *Valentine*, 232 F.3d at 356 (noting that in *Illinois v. Wardlow*, 528 U.S. 119,

125-26 (2000) the Supreme Court "held that headlong flight from the police in a high-crime area

provides reasonable suspicion, despite the fact that flight is not by itself illegal and could have

completely lawful and rational explanations").

Regarding the possession of firearms, because it is possible to carry a gun lawfully in the Virgin Islands, "'[a] mere allegation that a suspect possesses a firearm, as dangerous as firearms may be, does not justify an officer in stopping a suspect absent the reasonable suspicion [required by *Terry*].' Indeed, Virgin Islands law contains no presumption that an individual lacks a permit to carry a firearm." *United States v. Lewis*, 672 F.3d 232, 240 (3d Cir. 2012) (quoting *Ubiles*, 224 F.3d at 217) (internal parentheses and brackets omitted). However, the possession of a firearm— together with other suspicious activity—is a pertinent factor in determining reasonable suspicion. *Brown*, 765 F.3d at 290; *Valentine*, 232 F.3d at 357.

## 2. Analysis

The Court concludes that no seizure occurred regarding Defendant's magazine and that— regardless of whether Defendant abandoned the firearm—Detective Huertas had reasonable suspicion at that time to justify a seizure.

Beginning with the magazine, Defendant essentially argues that because there is insufficient evidence to establish abandonment, the officers therefore seized the magazine. The Court rejects this argument because the officers did not use physical force to take the magazine from Defendant, and Defendant did not "submit to a show of police authority" by standing up from his seated position, dropping the magazine, or running away. *See Valentine*, 232 F.3d 358.[3] Moreover, the evidence indicates that when the magazine fell to the ground, the officers left it in the same location until after Defendant's arrest when the forensic unit arrived on the scene to photograph the evidence. As discussed in Section II.B.2 below, by the time Defendant was

---

[3] Although Defendant argues that the manner in which the police vehicles pulled up to the building provoked Defendant to get up suddenly, the officer made no show of authority suggesting that Defendant had to leave his magazine behind as he stood up.

arrested, the officers had probable cause to believe that the magazine was contraband—specifically, a portion of an illegally possessed firearm.

Accordingly, any seizure of the magazine is justified by the plain view doctrine, which permits police to conduct a warrantless seizure of private possessions where three requirements are satisfied. *Horton v. California*, 496 U.S. 128, 141 (1990). First, the officer must be lawfully in the place "from which the evidence could be plainly viewed." *Id.* at 136. Second, the officer must have a "lawful right of access to the object itself." *Id.* at 137. Third, the incriminating nature of the object must be "immediately apparent." *Id.* at 136; *see also United States v. Stabile*, 633 F.3d 219, 241 (3d Cir. 2011) (citing *United States v. Menon*, 24 F.3d 550, 559-60 (3d Cir. 1994) (recognizing *Horton*'s three-part test)). Here, the officers first viewed the magazine as they were exiting their vehicles onto the building's parking lot—a lawful location for them to be. Similarly, the magazine landed on the sidewalk adjacent to the building, and nothing indicates that the officers—much like Defendant and the two individuals standing next him—were not lawfully permitted to access the sidewalk where the magazine fell. Finally, by the time the officers confiscated the magazine, Defendant had been arrested for illegal possession of a firearm and the illegality of the magazine he dropped was immediately apparent. Thus, by the time any seizure of the magazine occurred, such seizure was justified under the plain view doctrine.

With regard to Defendant's tossing of the firearm, the record is unclear whether Defendant was abandoning it or submitting to Detective Huertas' command to drop it.[4] The Court need not

---

[4] The fact that Defendant tossed the firearm shortly after Detective Huertas yelled "drop it" suggests that Defendant was complying with Detective Huertas' show of authority. However, the Court finds it significant that Defendant did not merely "drop" the firearm but tossed or threw it in one direction at the same moment he turned and began to run in the other direction. This suggests that Defendant may have been making a hurried attempt to conceal his illegal possession of the firearm—not submit to Detective Huertas' command.

reach this issue, however, because by the time Detective Huertas commanded Defendant to drop the firearm, he had reasonable suspicion to justify a seizure. As noted above, the reasonable suspicion analysis requires the Court to look at the totality of the circumstances to determine whether the officers "have a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Cortez*, 449 U.S. 417-18. The Third Circuit in *Valentine* held that officers had reasonable suspicion when they received a face-to-face tip that the defendant had a gun, the defendant was in a high-crime area at 1:00 a.m., and the defendant began walking away as soon as he noticed the police. *Valentine*, 232 F.3d at 357.[5]

Similar to the facts in *Valentine*, the police encountered Defendant at night in a high-crime area.[6] While the officers had no tip that Defendant possessed a firearm, the officers observed a black object fall from Defendant's person when he stood up, Officer Walcott immediately recognized the object as a firearm magazine, and Detective Cruz shouted "magazine." Moreover, much more than the defendant in *Valentine* who started walking away when he noticed the police, Defendant here took headlong flight away from the police as soon as they pulled up and even after Detective Huertas yelled "police, stop." *See United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir.

---

[5] The Government in *Valentine* (perhaps attempting to distinguish *Ubiles*) argued that—unlike the Virgin Islands—the regulatory scheme in New Jersey, where the incident occurred, "presumes that someone carrying a handgun does not have a permit to possess it until the person establishes otherwise." *Valentine*, 232 F.3d at 357. Given the facts of the case, however, the Third Circuit found it unnecessary to "consider New Jersey's regulatory scheme or determine under what circumstances New Jersey's presumption would provide reasonable suspicion for a *Terry* stop." *Id.* Thus, it appears that the Third Circuit's conclusion in *Valentine* would have been the same even under the Virgin Islands regulatory scheme regarding firearms.

[6] Defendant challenges the high-crime characterization of the location where he was arrested based on the cross-examination of Detective President. The Court rejects this challenge. Whatever doubt is cast by Detective President's cross-examination is substantially overcome by the testimony of Detective Huertas, who testified that he has personal knowledge of the high-crime nature of the area.

1997) (when officers stopped the defendant's car, his "furtive hand movements and refusal to obey the officers' orders" helped provide the officers with reasonable suspicion); *see also Valentine*, 232 F.3d at 359 (noting that "what [the defendant] did after he failed to comply with the police officers' orders [by charging towards the police officer] can be considered in evaluating reasonable suspicion"). These facts provided Detective Huertas with a "particularized and objective basis for suspecting" that Defendant was engaged in criminal activity. *Valentine*, 232 F.3d at 356 (noting that the Supreme Court in *Wardlow*, 528 U.S. at 125-26 "held that headlong flight from the police in a high-crime area provides reasonable suspicion"); *see also Brown*, 765 F.3d at 290 (considering presence of gun, the suspect's furtive movements consistent with concealing the gun, and fact that encounter occurred in a high-crime area in holding that reasonable suspicion existed).[7] This reasonable suspicion justified any seizure that occurred when Detective Huertas yelled "drop it" and Defendant tossed the firearm, as well as the seizure that occurred when Detective Huertas instructed Defendant to "get down" and Defendant complied.

Defendant argues that given the manner in which the officers pulled up to the building, his flight reaction was reasonable and thus not suspicious. In his Post-Hearing Brief, Defendant states the following:

> In this case, [Defendant] was well within his right to distance himself from a location when two unmarked vehicles traveling from opposite directions converged into a parking lot at midnight. The police officers created circumstances where flight was a reasonable reaction to the officers' unconventional approach.

---

[7] Although the Court finds that these facts establish reasonable suspicion, as discussed in Section II.B.2 below, at the time Detective Huertas yelled "drop it" there existed even more facts that Defendant was engaged in criminal activity. With these additional facts, the reasonable suspicion regarding Defendant's criminal activity ripened into probable cause.

(Dkt. No. 40 at 4).[8] Defendant is correct that he was "within his right" to distance himself from the officers when they first pulled up to the building. Absent a lawful seizure, there is nothing illegal about walking—or even running—away from police. However, "reasonable suspicion of criminal activity may be formed by observing exclusively legal activity." *Ubiles*, 224 F.3d at 217. Thus, even if—as Defendant asserts—the circumstances were such that it was reasonable for Defendant to flee, this does not preclude a finding of reasonable suspicion based in part on this flight. Regarding this point, the Court finds the following analysis from the Supreme Court in *Wardlow* to be instructive:

> Respondent and *amici* also argue that there are innocent reasons for flight from police and that, therefore, flight is not necessarily indicative of ongoing criminal activity. This fact is undoubtedly true, but does not establish a violation of the Fourth Amendment. Even in *Terry*, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. . . . *Terry* recognized that the officers could detain the individuals to resolve the ambiguity.
>
> In allowing such detentions, *Terry* accepts the risk that officers may stop innocent people.

*Wardlow*, 528 U.S. at 125–26. Here, when the officers pulled up to the building, Defendant immediately fled, while the two individuals standing next to him did not. Even assuming that

---

[8] Defendant also points to the fact that the two police vehicles were unmarked and asserts that "there is no credible inference that [Defendant] would have known that the cars contained police officers." (Dkt. No. 43 at 2). To the contrary, the Court concludes that there is more than sufficient evidence in the record to find that Defendant fled because he believed the two vehicles contained police. The vehicle which Detective Huertas and Officer Walcott occupied, although unmarked, had police department license plates on the front and back. Further, Detective Huertas and Officer Walcott were wearing polo shirts with police logos on the side and black bullet-proof vests with bold, white letters that said "Police" on the front and back. These facts all provide grounds to find that when Defendant saw the two unmarked vehicles pull up simultaneously, he was able to correctly assess that the vehicles were connected to the police. In any event, regardless of what Defendant knew or thought when he stood up, shortly after Defendant began to flee Detective Huertas yelled "police, stop." At that point, there can be little doubt that Defendant knew the vehicles contained police officers, but he nonetheless continued his headlong flight away from them.

Defendant's flight could be considered to be ambiguous—which the Court does not believe is the case—it is nonetheless an appropriate factor to consider when concluding that Detective Huertas possessed reasonable suspicion for a *Terry* stop and seizure by the time he commanded Defendant to drop the firearm.

### B.    Defendant's Arrest

Defendant argues that even if the officers had reasonable suspicion for the seizures, they lacked probable cause for his arrest. Defendant argues that his response indicating that he lacked a firearms license was obtained in violation of his *Miranda* warnings. (Dkt. No. 40 at 5-7). Without this statement, Defendant's argument goes, the officers lacked probable cause that Defendant was illegally carrying a firearm at the time of his arrest. From this, Defendant asserts that all of the evidence must be suppressed as fruit of the poisonous tree.

The Government argues that Defendant's response that he lacked a firearms license was obtained before Defendant was in custody and, therefore, did not violate *Miranda*. (Dkt. No. 39 at 3-4). Alternatively, the Government argues that even without Defendant's response regarding his firearms license, the police had probable cause to justify Defendant's arrest.

The Court concludes that Defendant's admission that he did not have a firearms license was obtained in violation of *Miranda*, but that the police nevertheless had probable cause to lawfully arrest Defendant.

### 1.    Applicable Legal Standards

*Miranda v. Arizona*, 384 U.S. 436 (1966) held that the "prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. *Miranda* warnings are required whenever a suspect has been

(1) "taken into custody" and (2) subject to "interrogation" by the Government. *Steigler v. Anderson*, 496 F.2d 793, 798 (3d Cir. 1974); *United States v. Dupree*, 617 F.3d 724, 731 n.7 (3d Cir. 2010) (plurality opinion).

A suspect is "in custody" when "there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest." *United States v. Leese*, 176 F.3d 740, 743 (3d Cir. 1999) (quoting *California v. Beheler*, 463 U.S. 1121, 1125 (1983)) (quotations omitted). Additionally, "the relevant environment [must] present[] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *United States v. Arena*, 629 F. App'x 453, 457 (3d Cir. 2015) (quoting *Howes v. Fields*, 132 S. Ct. 1181, 1190 (2012)); *see also Berkemer v. McCarty*, 468 U.S. 420, 442 (1984) (noting that the *Miranda* doctrine need only be enforced "in those types of situations in which the concerns that powered the decision are implicated" and then inquiring whether the relevant stop at issue "exert[ed] upon [the] detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights"). "This determination is objective, based on 'how a reasonable man in the suspect's position would have understood his situation.'" *United States v. May*, 87 F. App'x 223, 227 (3d Cir. 2003) (quoting *Berkemer*, 468 U.S. at 442). Further, an "interrogation" has been defined as "(a) conduct intentionally designed to evoke a confession, as well as (b) any conduct an officer should reasonably have foreseen would elicit an inculpatory response." *United States v. Bonner*, 469 F. App'x 119, 126 (3d Cir. 2012) (citing *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).

A violation of *Miranda* does not necessarily trigger the exclusionary rule such that all evidence derived from an unmirandized statement must be suppressed. As stated in the plurality opinion in *United States v. Patane*, 542 U.S. 630 (2004):

> [T]he *Miranda* rule is a prophylactic employed to protect against violations of the Self-Incrimination Clause. . . . [T]he core protection afforded by the Self-Incrimination Clause is a prohibition on compelling a criminal defendant to testify against himself at trial. . . . The Clause cannot be violated by the introduction of nontestimonial evidence obtained as a result of voluntary statements.

*Id.* at 636-37 (Thomas, J., plurality opinion). In other words, courts have rejected the proposition that "the fruit of the poisonous tree doctrine, which in the fourth amendment context requires the exclusion of evidence or confessions obtained as a result of a constitutional violation, extends to violations of the *Miranda* decision." *United States v. DeSumma*, 272 F.3d 176, 180 (3d Cir. 2001) (quoting *United States v. Johnson*, 816 F.2d 918, 922 (3d Cir. 1987)) (quotations omitted). However, the exclusionary rule will apply to suppress evidence that is derived from statements that are not only obtained in violation of the *Miranda* rule but are also obtained involuntarily. *See United States v. Jacobs*, 431 F.3d 99, 109 n.11 (3d Cir. 2005) ("While statements made by a defendant in circumstances violating . . . *Miranda* . . . are admissible for impeachment if their trustworthiness . . . satisfies legal standards, . . . *any* criminal trial use against a defendant of his *involuntary* statement is a denial of due process of law . . . ." (quoting *Mincey v. Arizona*, 437 U.S. 385, 397-98, (1978))) (quotations omitted) (emphasis in original).

"[A] statement is involuntary when the suspect's will was overborne in such a way as to render his confession the product of coercion." *United States v. Latz*, 162 F. App'x 113, 118 (3d Cir. 2005) (quoting *Lam v. Kelchner*, 304 F.3d 256, 264 (3d Cir. 2002)) (quotations omitted). Courts look to the totality of the circumstances to determine whether a statement was voluntary and consider "not only the crucial element of police coercion; the length of the interrogation; its location; its continuity; the defendant's maturity; education; physical condition; and mental health . . . [but also] the failure of police to advise the defendant of his rights to remain silent and to have counsel present during custodial interrogation." *United States v. Swint*, 15 F.3d 286, 289 (3d Cir.

1994) (internal citations omitted) (quoting *Withrow v. Williams*, 507 U.S. 680, 694 (1993)). "A necessary predicate to a finding of involuntariness is coercive police activity. Further, there must be some causal connection between the police conduct and the confession." *Jacobs*, 431 F.3d at 108 (internal citation omitted). "The burden is on the Government to establish, by a preponderance of the evidence, that a challenged statement was voluntary." *Id.*

Unlike a temporary investigatory detention or *Terry* stop, a warrantless arrest must be based on probable cause. *United States v. Brown*, 565 F. App'x 98, 101 (3d Cir. 2014). Probable cause exists "whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *Id.* (quoting *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002)) (quotations omitted). Courts are to assess the existence of probable cause "from the perspective of an objective law enforcement officer considering the totality of the circumstances." *Id.* "The probable cause inquiry is 'commonsense,' 'practical,' and 'nontechnical;' it is based on the totality of the circumstances and is judged by the standard of 'reasonable and prudent men.'" *United States v. Donahue*, 764 F.3d 293, 301 (3d Cir. 2014) (quoting *Illinois v. Gates*, 462 U.S. 213, 230-31 (1983)) (quotations omitted).

### 2.  Analysis

The Court first examines whether Defendant's response regarding the firearms license was obtained in violation of *Miranda* and concludes that it was.

As noted above, shortly after Detective Huertas saw Defendant toss an object, he yelled "get down," and Defendant laid down on the ground, and said "don't shoot." Detective Huertas then handcuffed Defendant and instructed Officer Walcott to search for the object that Defendant

had tossed. Once Officer Walcott found the firearm, he asked Defendant whether he had a license to possess a firearm. Defendant, who was still handcuffed, answered "no."

The Government does not assert that Officer Walcott's question regarding a firearms license was not an interrogation, or that Defendant was given his *Miranda* rights prior to Officer Walcott's question. Instead, the Government argues that Defendant was not in custody for *Miranda* purposes when Officer Walcott obtained his response. (Dkt. No. 39 at 3-4). The Government seems to assert that persons temporarily detained pursuant to an investigatory stop can never be "in custody" for *Miranda* purposes. (*Id.* at 3). Under this premise, the Government argues that the police conduct did not "constitute[] a full blown arrest" triggering the *Miranda* requirement because Defendant had only been handcuffed for 10-20 seconds before Officer Walcott's question and "Defendant was simply placed in handcuffs." (*Id.* at 4). The Court disagrees with the Government's legal premise.

The Government directs the Court's attention to *Maryland v. Shatzer*, 559 U.S. 98 (2010) for the Government's assertion that investigatory stops cannot constitute "custody" for purposes of *Miranda*. In *Shatzer*, the Supreme Court examined whether there had been a "break in *Miranda* custody" sufficient to allow officers to re-interrogate a defendant who—during a prior interrogation—had requested counsel. 559 U.S. at 112. Specifically, the defendant in *Shatzer* was an inmate who had been subjected to a custodial interrogation in connection with a new criminal investigation. *Id.* at 101. During the interrogation, the defendant had requested counsel, at which point the interrogation ended, and he was returned to the general prison population where he was serving an unrelated sentence. *Id.* Years later, the defendant, who was still incarcerated, was re-interrogated and made incriminating statements prior to requesting an attorney. *Id.* at 101-02. In analyzing whether a break in *Miranda* custody had occurred between the two interrogations, the

Supreme Court held that even though the traditional freedom-of-movement test was met simply by the defendant's imprisonment, the "inherently compelling pressures" of custodial interrogation ended when defendant was allowed to return to his normal life in prison. *Id.* at 112-14. In so holding, the Supreme Court observed that the "freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody" and that "*Miranda* is to be enforced 'only in those types of situations in which the concerns that powered the decision are implicated.'" *Id.* at 112 (quoting *Berkemer*, 468 U.S. at 437). The Supreme Court further observed that "the temporary and relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute *Miranda* custody." *Id.* at 113 (citing *Berkemer*, 468 U.S. at 439-40) (internal citation omitted).

A close examination of the Supreme Court's observation in *Shatzer* that "the temporary and relatively nonthreatening detention" involved in a *Terry* stop does not constitute *Miranda* custody reveals that *Shatzer* does not help the Government's argument. The Supreme Court in *Shatzer* cited *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984) for this proposition. In *Berkemer*, the Supreme Court stated that the "noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for the purposes of Miranda." 468 U.S. at 440. In so holding, the Supreme Court reasoned that (1) "detention of a motorist pursuant to a traffic stop is presumptively temporary and brief," and (2) in ordinary traffic stops the motorist does not "feel[] completely at the mercy of the police." *Id.* The Supreme Court went on to state that "[i]n both of these respects, the usual traffic stop is more analogous to a so-called 'Terry stop,'" and that "[t]he comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda." *Id.* at 439-40.

18

In sum, the law is clear that someone is not necessarily in custody for *Miranda* purposes just because the individual is not free to leave. *Shatzer*, 559 U.S. at 112. For this reason, the "usual" investigatory detention permitted by a *Terry* or traffic stop will not automatically constitute *Miranda* custody. *Id.*; *see also Howes*, 132 S. Ct. at 1189 ("Not all restraints on freedom of movement amount to custody for purposes of *Miranda*."). However, this is not to say that every police encounter that begins as the usual traffic stop or investigatory detention will never become the "type[] of situation[] in which the concerns that powered the [*Miranda*] decision are implicated." *Shatzer*, 559 U.S. at 112-13 (quoting *Berkemer*, 468 U.S. at 437) (quotations omitted). As the Supreme Court explained in *Berkemer*: "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." 468 U.S. at 440.

With the foregoing legal framework, the Court analyzes the totality of the circumstances surrounding Defendant's response to the firearms license question, and concludes that it was made while Defendant was in custody for *Miranda* purposes. At the outset, the facts in *Shatzer* are easily distinguishable in that, in the instant case, Defendant is not an inmate subject to constant restraints on his liberty. Moreover, the environment that Defendant was in when he made the incriminating statement cannot be characterized as the usual traffic stop or *Terry* stop as contemplated in *Berkemer*. Defendant saw two unmarked police vehicles quickly pull up to where he was sitting and four officers began exiting the vehicles as soon as they were parked. After Defendant fled, he knew that officers were chasing him, and he had tossed a firearm during the chase. Shortly before Defendant gave the statement regarding the absence of a firearms license, Detective Huertas— with his firearm drawn—had ordered Defendant to "get down"; Defendant lay face down on the ground while saying "don't shoot"; and Defendant was placed in handcuffs.

Under these circumstances, the Court finds that Defendant's liberty was restrained to a degree associated with a formal arrest, and he made his incriminating statement in the type of situation in which "the concerns that powered the [*Miranda*] decision are implicated." *Shatzer*, 559 U.S. at 112-13 (quoting *Berkemer*, 468 U.S. at 437) (quotations omitted); *see also Arena*, 629 F. App'x at 457; *United States v. Newton*, 369 F.3d 659, 676 (2d Cir. 2004) (noting that "[h]andcuffs are generally recognized as a hallmark of a formal arrest"). Thus, Defendant was in custody for *Miranda* purposes, and his response to Officer Walcott's interrogation must be suppressed.[9]

Although Defendant's statement will be suppressed, the Court finds that this does not also require the suppression of the firearm or render his subsequent arrest and the evidence obtained therefrom inadmissible. First, the Court finds that even without the statement there is probable cause for Defendant's arrest. As noted above, Defendant was in a high-crime area at night; a magazine fell from him; he fled as soon as the unmarked police vehicles pulled up; and he continued running after Detective Huertas yelled "police, stop." Additionally, Detective Huertas testified that as Defendant was running, he ran with one hand in front of him. This indicated to Detective Huertas that Defendant was getting ready to discard or use something—possibly a weapon. *See United States v. Yusuf*, 461 F.3d 374, 390 (3d Cir. 2006) (noting that the "probable cause determination is to be made only after considering the totality of the circumstances, which requires courts to consider the cumulative weight of the information set forth by the investigating

---

[9] In its Response, the Government also cites *United States v. Pichardo*, 2011 WL 2636147 (D.V.I. July 5, 2011) for the proposition that "persons temporarily detained pursuant to [investigatory] stops are not 'in custody' for the purpose of Miranda." *Id.* at *3. However, *Pichardo* is similarly unhelpful to Defendant's argument because the defendant there was subject to a typical traffic stop in which no handcuffs or other coercive measures were used. *Id.* at *2-3.

officer in connection with reasonable inferences that the officer is permitted to make based upon the officer's specialized training and experiences"); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (examining reasonable suspicion and noting that the totality of the circumstances approach "allows officers to draw on their own experience and specialized training to make inferences from and deduction about the cumulative information available to them that 'might well elude an untrained person'" (quoting *Cortez*, 449 U.S. at 418)). Finally, when Detective Huertas yelled "drop it," he saw Defendant toss an object away from himself and turn and run the other way. Officer Walcott soon found the object and confirmed that it was a firearm. Looking at the totality of the circumstances, the Court finds that these facts present probable cause for Defendant's arrest.

Defendant argues that because in the Virgin Islands "law enforcement officers do not have probable cause to arrest when they discover that a person is in possession of a firearm," under the facts in this case, the officers lacked probable cause. (Dkt. No. 40 at 4). The Court acknowledges that—as stated in *Lewis*—"possession of a firearm in the Virgin Islands, in and of itself, does not provide officers with reasonable suspicion," 672 F.3d at 240, and it certainly does not provide officers with probable cause. However, the Court disagrees with Defendant's related contention that the officers had "no basis to assert that there was probable cause to arrest [Defendant] for possessing an illegal firearm other than his possession of the same." (Dkt. No. 40 at 4-5).

As noted above, a magazine fell from Defendant's person as he stood up to flee; Defendant continued to flee after Detective Huertas yelled "police, stop"; and when commanded to "drop it," Defendant tossed the firearm in one direction, turned, and ran in the opposite direction. These facts cut against any reasonable inference that Defendant was lawfully possessing the firearm. That the magazine fell from him and he did not stop to recover it, continued running for a time after

21

Detective Huertas yelled "police, stop" and gave chase, and tossed the firearm away from him while turning and running in the opposite direction suggest—at the least—that Defendant was attempting to distance himself from his firearm. Defendant acted as if the firearm was contraband—not a lawfully possessed firearm for which he possessed a license. Taking a commonsense view of these facts together with the surrounding circumstances "warrant[s] a person of reasonable caution to conclude" that Defendant possessed the gun illegally. *Brown*, 565 F. App'x at 101 (quoting *Myers*, 308 F.3d at 255) (quotations omitted). Thus, even without Defendant's subsequent response indicating that he did not possess a firearms license, the officers possessed probable cause for Defendant's arrest.

Further, despite the fact that it was obtained in violation of *Miranda*, the Court finds that Defendant's statement regarding the firearms license can nonetheless be used to establish probable cause. To begin, the Court finds that Defendant's statement was obtained voluntarily. Detective Huertas drew his firearm during the chase, but re-holstered it once Defendant was on the ground. When Officer Walcott questioned Defendant, neither officer had his gun drawn; Detective Huertas had already responded to Defendant's plea by telling him that Detective Huertas was not going to shoot him; and there are no indications that either officer otherwise threatened Defendant. Also, Defendant had been in handcuffs for less than a minute when Officer Walcott questioned him. These facts show that Defendant's will was not "overborne in such a way as to render his confession the product of coercion." *Latz*, 162 F. App'x at 118 (finding that the defendant's admissions were voluntary even though the defendant was handcuffed and questioned by an officer who might have been holding a shotgun where the officer did not point the gun at the defendant or otherwise threaten him). Thus, Defendant's statement was voluntary, and a voluntary statement taken in violation of *Miranda* does not require the suppression of evidence derived from the

statement. *DeSumma*, 272 F.3d at 180 ("We hold that the fruit of the poisonous tree doctrine does not apply to derivative evidence secured as a result of a voluntary statement obtained before *Miranda* warnings are issued.").

Likewise, a voluntary statement taken in violation of *Miranda* can be used to establish probable cause for an arrest. On this point, the Court finds the Second Circuit case of *United States v. Morales*, 788 F.2d 883 (2d Cir. 1986) to be particularly instructive. In *Morales*, officers searched an apartment pursuant to a warrant and found glassine envelopes containing drugs. *Id.* at 884. An officer asked the individuals present in the apartment who owned the glassine envelopes, and the defendant answered that they were his. *Id.* The officers then advised the defendant of his *Miranda* rights and placed him under arrest. *Id.* After he was arrested, the officers discovered additional drugs on the defendant's person. *Id.* The district court ruled that the defendant's unwarned statement claiming ownership of the glassine envelopes was obtained in violation of *Miranda* and must be suppressed. *Id.* at 885. Without this statement, the district court found that the officers lacked probable cause for the defendant's arrest and, therefore, the evidence derived from the defendant's arrest must also be suppressed. *Id.* On appeal, the Government did not challenge the finding that the defendant's pre-arrest statement must be suppressed, but argued that the statement could still be used to establish probable cause. *Id.* The Second Circuit agreed and held that "the unwarned statement was a proper basis for probable cause to arrest," the arrest was therefore legal, and the evidence seized after the arrest should not have been suppressed. *Id.* at 886-87. In so holding, the Second Circuit reasoned as follows:

> As we examine the facts in this case to determine whether there was probable cause to arrest [the defendant], we can find no 'valid and useful purpose' to be served by disregarding his pre-warning statement to the officers who were acting in good faith. Where, as here, there is no indication of trickery or coercion, there is no justification for requiring a police officer to ignore incriminating admissions in arriving at a conclusion that there is probable cause for an arrest. Suppression of

the uncounseled statements at the trial is sufficient to further the purposes of *Miranda*.

*Id.* at 886.

The Court notes that other courts have shared the Second Circuit's conclusion that a voluntary statement taken in violation of *Miranda* can be used to establish probable cause. *See, e.g.*, *United States v. Guillen*, 657 F. App'x 690, 692 (9th Cir. 2016) (holding that incriminating, pre-arrest statements "may be used to determine whether probable cause existed even if [the defendant] should first have been administered *Miranda* warnings"); *United States v. Patterson*, 812 F.2d 1188, 1193 (9th Cir. 1987) (holding that voluntary statements obtained in violation of *Miranda* could be used to establish probable cause for the purposes of a warrant); *United States v. Jones*, 572 F. Supp. 2d 601, 612 (W.D. Pa. 2008), *aff'd*, 388 F. App'x 175 (3d Cir. 2010) (observing that "exclusion of an un-mirandized voluntary custodial statement for purposes of trial does not prevent the use of that statement for establishing probable cause under the Fourth Amendment; the exclusionary rule of the Fourth Amendment operates independently of the *Miranda* rule"); *United States v. Aragon-Ruiz*, 551 F. Supp. 2d 904, 913-14 (D. Minn. 2008) (noting that "prohibiting consideration of a defendant's pre-*Miranda* statements in determining probable cause does not further protect a defendant's right to be free from compelled testimony at trial" and holding that "because there is no evidence of trickery or coercion . . . the court considers defendant's pre-*Miranda* statements in determining whether the agents had probable cause at the time of his arrest").[10]

---

[10] Although not explicitly addressed, the Court notes that the Third Circuit in *DeSumma* implicitly approved the proposition that a statement obtained in violation of *Miranda* can be used to establish probable cause. In *DeSumma*, the defendant gave an unwarned statement that he had a gun in his car. 272 F.3d at 178. Although the district court found that the statement was obtained in violation of *Miranda* and suppressed it, it held that the *Miranda* violation did not require the suppression of the derivative physical evidence—namely, the gun. *Id.* at 179. In affirming the district court's

Here, Officer Walcott's question regarding the firearms license was straightforward, and there is "no indication of trickery or coercion." *Morales*, 788 F.2d at 886. Accordingly, the Court finds that Defendant's voluntary response that he did not possess a license can be used to establish probable cause for his arrest—even though the response itself was taken in violation of *Miranda* and must be suppressed.

Taking into consideration Defendant's response indicating that he did not have a license, the evidence is clear that the officers had probable cause to arrest Defendant. Defendant fled when the police approached; he did not initially stop in response to the police's order to do so; Detective Huertas observed Defendant toss an object; Officer Walcott confirmed that this object was a firearm; and Defendant informed the officers that he did not have a license to possess a firearm in the Virgin Islands. At this point, there was "reasonably trustworthy information . . . to warrant a person of reasonable caution to conclude that an offense has been committed," specifically unlawful possession of a firearm. *Brown*, 565 F. App'x at 101 (quoting *Myers*, 308 F.3d at 255) (quotations omitted). Because Defendant was lawfully arrested, the evidence found on Defendant's person subsequent to his arrest (the cash, plastic vials, and white substance that tested positive for crack cocaine) is admissible.

### III.   CONCLUSION

Based on the foregoing, the Court finds that Defendant's response to Officer Walcott's question regarding whether he had a firearms license was obtained in violation of *Miranda* and will be suppressed. However, the Court finds that the remaining evidence (the firearm, magazine, cash, plastic vials, and white substance that tested positive for crack cocaine) is admissible. Thus,

---

decision, the Third Circuit did not expressly hold that the defendant's statement could be used to establish probable cause, but noted that "the District Court concluded that the defendant's voluntary statements provided probable cause to search his car." *Id.*

the Court will grant in part and deny in part Defendant's "Motion to Suppress Tangible Evidence and Incorporated Memorandum of Points and Authorities in Support Thereof" (Dkt. No. 26). An appropriate Order accompanies this Memorandum Opinion.

Date: January 17, 2017

_____/s/_____
WILMA A. LEWIS
Chief Judge